UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICHARD ANDERSON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>PACIFIC MARITIME ASSOCIATION, and ILWU LOCAL 23,<br><br>　　　　Defendants. | CASE NO.　　C05-5570JKA<br><br>ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |

　　　　This case has been reassigned to the undersigned magistrate judge for the conduct of all proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) on the consent of the parties. The matter is before the court on ILWU LOCAL 23's ("ILWU") motion for summary judgment (Doc. 19) and Pacific Maritime Associations's ("PMA") motion for summary judgment (Doc. 40).

　　　　Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding whether to grant summary judgment, the court must view the record in the light most favorable to the nonmoving party and must indulge all inferences favorable to that party. Fed.R.Civ.P. 56(c) and (e). When a motion for summary judgment is made and supported as provided in Fed.R.Civ.P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

ORDER
Page - 1

The Court, after reviewing the motions, supporting pleadings, plaintiffs' responses, and the remaining record, finds and orders as follows:

*(1) CLAIMS AND CAUSES OF ACTION*

Plaintiff's Amended Complaint (Doc. 6) claims Mr. Richard Anderson, has been damaged due to retaliation and disparate treatment at his workplace in violation of Title VII and RCW 49.60, *et seq*. See Doc. 6 at 3-4. Plaintiff supports these claims for relief alleging a co-worker, Doug Johnson, used profanity, threats, and intimidation against Mr. Anderson. Plaintiff further alleged that his Union conducted a hearing on the matter resulting in a finding of unacceptable conduct by Plaintiff and a decision to reprimand Plaintiff, including suspension from his job for six months. Plaintiff names two defendants in his Amended Complaint: (i) the ILWU and (ii) the PMA. Plaintiff claims defendants breached their responsibilities under the Collective Bargaining Agreement and Plaintiff's Bill of Rights as a member of the union. Plaintiff specifically alleges: (1) defendants retaliated and discriminated against him during the procedural process of investigating and considering the incident involving Doug Johnson; (2) the ILWU failed to represent Mr. Anderson; and (3) defendants retaliated against him by suspending and demoting him.

To approach the issue of summary judgment the court looks to the pleadings to first determine what claims and causes of actions have been raised. A review of plaintiff's pleadings raise many questions. The court finds the Amended Complaint vague and convoluted with regard to what claims and causes of action Mr. Anderson is setting forth. As noted above, the Amended Complaint appears to be based on retaliation and disparate treatment under federal and state law. Those causes of action are presented under the title, "III. CLAIM FOR RELIEF" and "IV. SECOND CLAIM FOR RELIEF", which is followed by a factual section containing the facts supporting those state and federal claims. The Amended Complaint then contains a section entitled "VI. CAUSES OF ACTION", which is subtitled, "Breach of Contract, Disparate Discipline, and Failure to Represent," and the following two sections entitled, "VII. FAILURE TO REPRESENT" and "VIII. DEREGISTRATION." Further inconsistencies are found in the caption of the complaint which includes tort claims for intentional or negligent infliction of emotional distress and outrage, and citations to 42 U.S.C. 1981. The body of the Amended Complaint does not specifically mention or discuss state tort law or 42 U.S.C. § 1981 as a basis for a claim or cause of action. The

sectioning and labeling of the Amended Complaint makes it difficult to decipher and determine the exact claims and causes of actions being raised in this matter.

Turning to Plaintiff's pleadings filed in response to the dispositive motions, the court takes note of Plaintiff's clear statement, "None of the Plaintiff's claims are time barred because **all** of his claims are Title VII claims and therefore the Title VII statute of limitations apply" (emphasis added).  Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 40) at 3.  In the same pleading Plaintiff argues, "Plaintiff's breach of contract claims and breach of duty of fair representation claims against the Union and PMA are independent Title VII claims which are not precluded by § 301", and "Because Anderson's claims for failure to represent and breach of contract, are based on race discrimination, under Title VII, Title VII statutes apply and therefore his claims are not time barred."  Id. at 10 & 13.  The apparent clear indication by Plaintiff that the court is dealing with only Title VII claims is clouded by Plaintiff's earlier pleading which states, "All of Plaintiff's claims against the Union must survive summary judgment because § 301 does not apply; Plaintiff was disparately disciplined, Defendant retaliated against Plaintiff and finally emotional distress claims cannot be dismissed on summary judgment."  Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 30) at 12.  Elsewhere, Plaintiff states:

> By contrast, Mr. Anderson filed suit in federal district court alleging federal causes of action.   Specifically, violations of section 42 U.S.C. section 1981 & 1983, as well as title VII claims.
> Clearly, Anderson brought federal claims in federal court.  His causes of action are not state law claims substantially dependent upon analysis of the CBA [Collective Bargaining Agreement].

at 13.

In sum, it is clear Plaintiff has based Title VII claims on alleged disparate and retaliatory treatment by defendants in the process of investigating, considering and determining an appropriate action based on the grievances filed by the employers and Plaintiff's co-worker.

*(2)  DISPARATE TREATMENT AND RETALIATION*

Title VII of the Civil Rights Act of 1964 specifies "[i]t shall be an unlawful employment practice for an employer - (1) to··· discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).   Title VII further provides:

> It shall be an unlawful employment practice for an employer to discriminate against

ORDER
Page - 3

> any of his employees, ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

A Title VII plaintiff can present a prima facie case of discrimination in one of two ways: either through direct evidence of discriminatory intent, or by satisfying the factors set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Tarin v. County of Los Angeles, 123 F.3d 1259, 1263-64 (9th Cir.1997).

Direct evidence of discrimination is evidence that, "if believed, proves the fact of discriminatory animus without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir.1998) (brackets omitted).  Under McDonnell Douglas, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. McDonnell Douglas Corp 411 U.S. at 802.  Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. Id.  The basic allocation of burdens and order of presentation of proof for such claims follows three steps.  A plaintiff must first establish a prima facie case of discrimination.  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision.  Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.  Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (1986).   In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce "specific, substantial evidence of pretext." Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983).

Similarly, to establish a retaliation claim, a plaintiff must demonstrate (1) that he was engaging in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal link between his activity and the employment decision. Hashimoto v. Dalton, 118 F.3d 671, 679 (9th Cir.1997); *see also* Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir.1994); Johnston v. Horne, 875 F.2d 1415, 1421 (9th Cir.1989); Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir .1982).  To show the requisite causal link, the plaintiff must present evidence sufficient to raise the

ORDER
Page - 4

inference that the protected activity was the likely reason for the adverse action. <u>Cohen</u>, 686 F.2d at 796. Once the plaintiff has established a prima facie case, the burden of production devolves upon the defendant to articulate some legitimate, non-retaliatory reason for the adverse action. <u>Showboat</u>, 25 F.3d at 1464. The defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff. <u>Cohen</u>, 686 F.2d at 796. If the defendant meets this burden, the plaintiff must then show that the asserted reason was a pretext for retaliation. <u>Showboat</u>, 25 F.3d at 1464. The ultimate burden of persuading the court that the defendant unlawfully retaliated remains at all times with the plaintiff. <u>Cohen</u>, 686 F.2d at 797.

As noted above, plaintiff claims defendants unfairly discriminated and retaliated against him when he was suspended for six months following a dispute with co-worker, Doug Johnson. Considering the burdens in a disparate treatment and retaliation claim, it is important to review the factual basis for the incident and the actions by defendants. After reviewing the record the court finds the following summary of undisputed facts:

In the early morning hours of October 5, 2003, while unloading a Maesrk/Horizon Line ship, Plaintiff and Doug Johnson had a verbal disagreement over the company radio. Later the same day, at the Union hall, Plaintiff and Mr. Johnson ran into one another and the verbal dispute continued. Mr. Johnson complained to his employer (the Maersk/Horizon Line supervisor) and filed an incident report with the Joint Port Labor Relations Committee ("JPLRC")(a committee made up of Union representatives and PMA member representatives). In its entirety Mr. Johnson's report states:

> Conversation begins with some confusion over the flat racks that were put on bomb carts and the top picks could not pick them up so they were sent back to the hook to have Doug Johnson put them onto chassis. Doug Johnson traveled the crane to the aft end of the hatch to discharge some 20 footers. Seeing that there were no chassis and only bomb carts under the gear Mr. Anderson asked what I was doing. I said I was going to discharge the 20's onto bomb carts, Mr. Anderson said he wanted me to pick up the flat racks and put them on chassis. I responded,"there are no chassis under the gear so it doesn't make sense to deal with the flat racks until we actually have chassis. There were probably 2 to 3 empty bomb carts staged waiting for loads ready for discharge. Mr. Anderson's response to me at this point was "fuck you, you are treating me like a child". I said "hey pal, I don't deserve that and I am not taking that kind of crap over the radio". I then contacted Richard Anderson's supervisor/supercargo and informed him of what just happened. He said he would have a talk with him. I then went to the gangs channel that I was working in and said I expected an apology. Hearing none I continued my job. At the end of the shift I went in to the foreman's office and filed an incident report with Maersk/Horizon Line. I talked to the supercargo and asked if he had talked to Richard Anderson. He said he had not and that Mr. Anderson had already left the job. The next day at the Union Hall at approximately 4:00 PM on 10/05/03 I was in dispatch office when Richard Anderson walked in and I

> informed him that I had filed an incident report. His response was "what, are you talking to me?" I said "yes". He said I don't want to talk to you, I don't want anything to do with you and I don't want you talking to me" I then pointed my finger at him and told him don't tell me to "fuck off" on the radio ever again. His response was after he slapped my hand out of the way and taking a, what I perceived a threatening stance he said, "you don't know how close you are to me fucking you up. And I WILL fuck you up". He accused me of grand standing him in the office in front of people. I told him that was not my intention and if he wanted to step into the board room and talk man to man, (which he refused to do) he then told me he doesn't want anything to do with me and that I didn't know how close I was to him fucking me up. As he turned to walk out of office I told him "stop threatening me. He walked out of the office, punched doorframe as he was leaving. He wandered outside and preceded to shadowbox, stretch and round house kicking exercises outside the front door of union hall. Several union members, Dave Sanderson, and Mike Henderson and dispatchers Jerry Burks and Roy Renggli witnessed this.
> After crane pick I went to Fife Police Dept and filed a voluntary police report against Mr. Richard Anderson for threatening me with physical harm.

Exhibit D attached to Plaintiff's Response to Summary Judgment (Doc. 30). Plaintiff did not file any similar kind of report.

Following the incident at the worksite, the JPLRC received an employer's complaint regarding the incident filed or initiated by Maersk/Horizon Line in accordance with Sections 17.125 and 17.81 of the pertaining union rules and regulations. Minutes from the JPLRC meetings indicate that the employer's complaint, alleging Mr. Anderson's actions created a hostile work environment by using vulgar language against Mr. Johnson, was first discussed on November 20, 2003, and the matter was held over at the request of the Union representatives. The issue was further addressed at the JPLRC meeting on December 18, 2003, when the Union asked that the complaint be withdrawn. At the request of the employers representatives that matter was again held over until the next meeting. On January 15, 2004, the Union again requested the withdrawal of the employer's complaint, and at this meeting the employers agreed. However, at the same meeting the committee took up the grievance filed by Doug Johnson, which is based not only on the work place verbal dispute on the radio, but also on the dispute that took place at the union hall later in the day. Based on Mr. Johnson's grievance, the committee decided to "cite" Mr. Johnson, Mr. Anderson and witnesses to appear at the next scheduled JPLRC meeting, February 19, 2004.

Prior to the JPLRC meeting, Mr. Anderson met with union representatives and informed them that he did not want the grievance considered by the JPLRC, but instead wanted the matter taken straight to arbitration despite contrary advice from the union representatives. On February 17, 2004, at an Agenda Day meeting, Mr. Anderson again met with union representatives regarding the grievance, and advised them that he had changed his mind about going straight to arbitration. Plaintiff also informed the union

officials that he would not be able to appear at the February 19, meeting to testify about the incident, explaining that he had vacation planned.  The JPLRC met on February 19, 2004, and considered statements from Doug Johnson, Mike Henderson, Jerry Burks, and David Sanderson.  The committee noted that Mr. Anderson was not available to attend and rescheduled his appearance for the following month.  Mr. Anderson appeared before the JPLRC on March18, 2004.  Based on their investigation, the JPLRC found Mr. Anderson guilty of unacceptable conduct in the workplace and decided to impose a penalty of one year off work with six months suspended and a two year probationary period.  On March 26, 2004,  Plaintiff received a letter from the Committee explaining their actions, stating the suspension would begin on April 1, 2004.

Plaintiff sent two separate letters in response to the JPLRC decision. The first letter was sent the JPLRC asking for copies of the committee's investigation and an explanation for its decision.  In addition, Plaintiff asked for representation and guidance as to the process of challenging the committee's decision.  The second letter was addressed to the Union asking for representation to appeal the decision and reinstatement. On April 14, 2004, Tim Faker, a union official,  responded to Mr. Anderson's letter, explaining that an adjudication by the JPLRC is a joint-decision made between both union representatives and PMA employer representatives, and as such, it is a final decision without any further way to appeal or challenge the decision.

Plaintiff also filed a special 13.2 discrimination grievance with the Union/PMA and a claim with the National Labor Relations Board ("NLRB") against the Union and PMA.  The court has not been provided a copy of Plaintiff's discrimination grievance, but the matter was considered by an arbitrator who wrote, "In your grievance you claim discriminatory discipline, verbal abuse and retaliatory action, yet provide no information to support any of these claims.  There is no sound basis for classifying this grievance as one qualifying for the special 13.2 machinery."  (A 13.2 grievance is one of three types of employment claims that can be entertained by the Union/PMA.  In contrast to the normal grievance, such as the one filed by Mr. Johnson, and an Employer's Complaint, like the one filed by Maersk/Horizon line, a 13.2 claim triggers a special procedure reserved for the most serious claims of discrimination or harassment.  A 13.2 claim is not considered by the JPLRC and goes straight to an arbitrator and requires certain procedural due process safeguards.) The NLRB also rejected Mr. Anderson's claim, finding that further proceedings were

not warranted and a formal complaint was not issued.

Following receipt of the NLRB's decision, Plaintiff filed a complaint with the EEOC, alleging discrimination against the Union and the PMA for breach of contract and failure to represent. On July 11, 2005, the EEOC notified Plaintiff that it was unable to conclude that a violation of the statute had been established, and that he had 90 days to file a complaint in federal or state court to challenge the decision.

Interestingly Plaintiff states, "On May 18, 2005, Anderson filed suit in federal court and on August 14, 2005, he served the Defendants. Anderson was required to exhaust his administrative remedies and he could not file suit before receiving the EEOC right to sue letter on his Title VII Claims." In fact, the original Complaint in this matter was filed in state court on May 18, 2005, in which he alleged nine claims for relief based on violations of state law. The Complaint was removed by the PMA to this court on September 1, 2005, based on diversity of the parties and a federal issue, involving application of Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. Plaintiff subsequently, on November 16, 2005, filed the Amended Complaint, which raises claims based on Title VII.

After carefully reviewing the facts and the arguments presented by all the parties, the court finds Mr. Anderson has failed to establish a prima facie case. The court also finds defendants have articulated a legitimate nondiscriminatory reason for the six month suspension, and Plaintiff has failed to demonstrate that the alleged reasons for the suspension were a pretext for another motive which is discriminatory.

First, Plaintiff has failed to establish a prima facie case of disparate treatment. To establish a prima facie case of discrimination, Plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. Here, Plaintiff fails to show the court that he has been treated less favorably than others similarly situated.

In order to show that the "employees" allegedly receiving more favorable treatment are similarly situated, the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects. See Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 660 (9th Cir.2002) (citing with approval the Second Circuit's opinion in McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir.2001)-which stated that "similarly situated" means that employees must "be similarly situated in all material respects"-as "explaining [the] minimal showing necessary to establish

co-workers were similarly situated"); *see also* Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998) (holding that "the plaintiff must show that the 'comparables' are similarly-situated in all respects" (citation and internal quotation marks omitted)); Lynn v. Deaconess Med. Center-West Campus, 160 F.3d 484, 487 (8th Cir.1998) (requiring that employees be "similarly situated in all relevant respects" (citation and internal quotation marks omitted)).

Plaintiff argues he has been dealt harsher punishment than co-workers Aaron Kamel, Keith Kossman, Kyle J. Copeland, Tim Faker, Darrel Rohar, and John Simmons, who allegedly committed similar offenses. The court finds none of these individuals "similarly situated" to Plaintiff. None of the individuals has a history of disciplinary actions similar to Plaintiff's history, which is extensive. With footnotes and citations to the supporting declarations omitted, Defendant accurately summarized Plaintiff's work history record as follows:

> Anderson has a long history of trouble with co-workers and employers. Prior to this case, deregistration was considered on three occasions. Additionally, prior to this case, Plaintiff was accused of acting out in the Dispatch Hall or the payroll office on three occasions. The union has taken three of Anderson's cases to arbitration. Anderson has made numerous appearances before the JPLRC:
>
> 1.      1996 Incident. Anderson was accused of engaging in disruptive conduct in the Dispatch Hall.. He was admonished by the LRC to adhere to dispatch rules and conduct. He was warned that further disruptive conduct would result in further disciplinary action and possibly jeopardize his registration status.
>
> 2.      1997 Incident. Anderson was counseled regarding his obligation to accept the work offered to him by the dispatcher, and was assessed 30 days off the work list. Fifteen days off the work list would be suspended if Anderson enrolled in a certified anger management course.
>
> 3.      May 15, 1998 Incident. Anderson was accused by PMA employers of subjecting a female payroll clerk to "profane, abusive, and sexually offensive language." The union and PMA disagreed over the penalty to be imposed at the JPLRC level, so the matter went before the Area Arbitrator; Randy Vekich on July 10, 1998.
>
> The employers argued to the Arbitrator that Anderson should be deregistered "due to the severity and repetitious nature of his hostile and, in this case, sexually harassing behavior." The union defended Anderson arguing that his comments were not sexual harassment and that deregistration was too harsh a penalty. The union pointed out that in the midst of going through a divorce, Anderson's paycheck was mistakenly given to his estranged spouse without his knowledge or permission. The union acknowledged that although Anderson's words were indeed harsh, they were not directed to the payroll clerk; rather, he was cursing his estranged spouse for outwitting the company.
>
> In Award W-07-98, issued July 10, 1998, Arbitrator Randy C. Vekich wrote, "It is apparent Richard Anderson III needs help regarding anger management." Arbitrator Vekich penalized Anderson 18 months off the work list, but suspended the penalty on condition that Anderson

    4.  May 29, 1998. Prior to Arbitrator Vekich's July 10 ruling on the May 15 incident, but not considered by Vekich, Anderson was issued a letter from the JPLRC on July 16, reminding him of his obligation to work without using foul or abusive language, and notifying him that future violations would result in further discipline.

    5.  June 3, 1998. Anderson was accused by the employers of walking off the job without explanation. The incident was considered by the JPLRC on June 25 and again on July 16, where the union informed employers that Anderson would be fined $50 for leaving the job without securing a replacement, and the matter was dropped.

    6.  December 22, 1998. Anderson was accused by the employers of refusing to work as directed and being insubordinate to a supervisor. The union proposed Anderson lose wages for a day and the complaint be withdrawn. The employers agreed.

    7.  July 27, 2000. Employers issued a complaint against Anderson for creating a hostile work environment during an incident involving co-worker Darrell Booth. The JPLRC investigated the complaint and on December 12, 2000 issued Anderson a letter of reprimand which stated in part, "The JPLRC agreed to issue you this letter notifying you that they do not condone the behavior in which you were engaged. You are reminded to not conduct yourself in such a manner, as the work site is a place of business and the .JPLRC will not condone any disruption to the harmony of the relationship of the patties."

    8.  September 1, 2000. Employer complaint for creating a hostile work environment by engaging in an altercation with co-worker John Simmons. The JPLRC investigated the complaint and on December 21 agreed that both Anderson and Simmons were guilty of violating Section 17 of the CBA. But the employers wanted to deregister Anderson and the union objected. The employers argued that deregistration was warranted because of Anderson's history of similar outbursts. The union proposed Anderson receive only a letter of reprimand. They failed to agree, so the issue of the proper discipline to impose on Anderson was taken to Arbitrator Vekich.

  Vekich agreed with the employers that Anderson deserved deregistration, but he ordered deregistration held in abeyance as long as Anderson stayed out of trouble, and he suffered the following penalty: off dispatch for 60 days; dispatched for four months, and then denied dispatch again for 30 days. Arbitrator Vekich ordered if any of the conditions were not met, Anderson would suffer immediate deregistration.

    9.  March 7, 2001. Employers file a complaint against Anderson for failing to work as directed, being insubordinate, and creating a hostile work environment by engaging in an altercation with a Chief Supervisor. Anderson apologized in writing, but the PMA still wanted him deregistered. The parties again failed to agree on what discipline to impose on Anderson, so the matter went to Arbitrator Vekich again.

  Vekich did not find Anderson guilty of the charges brought by the employers, but instead found Anderson had merely failed to report for work. The matter of the appropriate penalty was referred by the Arbitrator back to the JPLRC. The union could find no record of any penalty imposed.

    10.  July 27, 2003. Co-worker Darrel Rohar filed a grievance against Anderson for an alleged incident between them. The matter was thoroughly investigated by the JPLRC, including taking testimony from several witnesses. The union ultimately withdrew the grievance in November 2003.

Defendant ILWU's Motion for Summary Judgment at 7-10.

  It is clear to the court that the Union representatives, when discussing the issue with Mr. Anderson

ORDER
Page - 10

and at the JPLRC meetings, were very concerned about Mr. Anderson's disciplinary history. Richard Castendeda, the Chairman of the Union's Labor Relations Committee counseled Mr. Anderson not to take the matter to arbitration and stated, "Given the strong witnesses we had already seen, and Anderson's repeated offenses, we concluded it was likely Arbitrator Vekich would find Anderson guilty." Mr. Castendeda stressed that the Union representatives felt that because it had been less than fours years since Arbitrator Vekich had previously deregistered Mr. Anderson and placed him on probation, it was likely that Mr. Vekich would suspend Mr. Anderson for at least a year or deregister him if they did not come up with a viable solution at the JPLRC meeting. Plaintiff has not presented any similar situated individuals who were treated more favorably.

Next, the court finds Plaintiff has failed to establish a prima facie case of retaliation. As noted above, to establish a retaliation claim, a plaintiff must demonstrate (1) that he was engaging in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal link between his activity and the employment decision. Plaintiff has not alleged sufficient facts to show a causal link between the filing of any grievances or lawsuits – his "protected activity"– and the decision to suspend him for six months.

Plaintiff argues defendants conduct "constitutes prima facie retaliation." Specifically, Plaintiff refers to the fact that the employer and Union filed a grievance against Mr. Anderson after this lawsuit was filed, alleging Mr. Anderson created a hostile work environment. Plaintiff further states defendants were aware of his 13.2 grievance, which was dismissed, and a previous retaliation claim filed against the Union. Plaintiff declared, "All of my problems began after I participated in a class action lawsuit, on behalf of African American workers in the late 1990's. We settled the lawsuit. Ever since then, the Union has retaliated against me." The court is not persuaded by these allegations and arguments.

The allegation regarding a causal link between a class action lawsuit in the late 1990's and Mr. Anderson's six month suspension in March 2005 is too remote. *See* <u>Villiarimo v. Aloha Island Air</u>, 281 F.3d 1062, 1065 (9th Cir.2002) (finding that 18-month lapse was too long to create an inference of causation); <u>Manatt v. Bank of American, NA</u>, 339 F.3d 792, 802 (9th Cir.2003) (holding that nine months was not sufficiently close to establish a causal link). The other "protected acts", i.e., the filing of the 13.2 grievance and the employer's filing of a grievance all happened *after* the JPLRC had made its decision to

1  suspend Mr. Anderson for six months.   There is not causal link between the defendants actions to suspend
2  him for six months and subsequent acts.   In other words, Plaintiff has failed to show any causal link
3  between a protected activity and the defendant's alleged adverse employment decision.

4        Even if Mr. Anderson had shown similarly situated individuals treated more favorably or a causal
5  link to his protected activity, his disparate treatment and retaliation claims fail because there is no evidence
6  of pretext.  In response to the Amended Complaint, defendants have shown a legitimate nondiscriminatory
7  reason for the six month suspension.  It is clear to the court that the six-month suspension was based on
8  the JPLRC's consideration of the witness statements, plaintiff's statements and plaintiff's disciplinary
9  history, which included  two separate incidents requiring his attendance in anger management programs.  It
10 is undisputed that the Union representatives had valid concerns that if the matter was allowed to proceed
11 to arbitration that Mr. Anderson would have faced significantly greater punishment than the six-month
12 suspension.  Plaintiff has failed to produce "specific, substantial evidence of pretext," demonstrating that
13 the alleged reasons for the suspension were a pretext for a discriminatory motive.

14 *(3) Section 301 of the National Labor Relations Act*

15       Both defendants argue in their respective motions that Plaintiffs claims based on a breach of duties
16 or terms of the Collective Bargaining Agreement are preempted by Section 301 of the National Labor
17 Relations Act.  Section 301 provides:

18     **Suits by and against labor organizations**

19     (a) Suits for violation of contracts between an employer and a labor organization
20     representing employees in an industry affecting commerce as defined in this chapter ⋯ may
    be brought in any district court of the United States having jurisdiction of the parties,
21     without respect to the amount in controversy or without regard to the citizenship of the
    parties.

22 29 U.S.C. § 185.  Section 301 of the LMRA provides exclusive federal jurisdiction over "suits for violation
23 of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). The operative test for
24 federal jurisdiction under § 301 is not the narrow question of whether a federal question is presented on the
25 face of the plaintiff's complaint, but the broader inquiry of whether interpretation of a CBA "inhere[s] in
26 the nature of the plaintiff's claim." <u>Cramer v. Consol. Freightways, Inc.</u>, 255 F.3d 683, 691 (9th Cir.2001).
27 Those claims arising under arising under § 301 of the Labor Management Relations Act are governed by
28 the six-month statute of limitations of § 10(b) of the National Labor Relations Act. <u>DelCostello v.</u>

1  Teamsters, 462 U.S. 151, 155, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

2      Plaintiff has limited his claims to those based on Title VII.  In response to defendants' § 301
3  argument, Plaintiff argues, "Plaintiff's breach of contract claims and breach of duty of fair representation
4  claims against the Union and PMA are independent Title VII claims which are not precluded by § 301",
5  and "Because Anderson's claims for failure to represent and breach of contract, are based on race
6  discrimination, under Title VII, Title VII statutes apply and therefore his claims are not time barred."
7  Defendants do not take issue with Plaintiff's position, maintaining Section 301 preempts and time bars all
8  of plaintiff's other claims, specifically Plaintiff's state law claims.  As argued above, defendants'
9  successfully argued Plaintiff has failed to present sufficient facts to maintain his disparate treatment and
10 retaliation claims or a genuine issue of issue of material fact regarding his Title VII claims.

11     As a matter of housekeeping, the court agrees that any state law claim presented by Plaintiff is
12 subject to analysis of the CBA and preemption by Section 301.  Moreover, any such claim would be time
13 barred by the applicable six-month time limit.  Here, the six-month period began to run on or about April
14 14, 2004, when Mr. Anderson received notice from Tim Faker that the Union would not pursue his appeal
15 or challenge to the JPLRC's decision finding him guilty of inappropriate conduct in the workplace and the
16 suspension.  The six-month time limit to bring a Section 301 claim to challenge the JPLRC's decision, the
17 Union's representation during that process, expired on or about October 15, 2004, and the lawsuit was not
18 filed until May 2005. The filing of the claims cognizable only under § 301 of the Labor Management
19 Relations Act was therefore untimely.

20     *(4) C*ONCLUSION

21     Based on the discussion above and the undisputed facts, Plaintiff has not supported a prima facie
22 case for either disparate treatment or retaliation in violation of Title VII.  The court further finds
23 defendants have persuasively articulated a legitimate nondiscriminatory reason supporting the decision to
24 suspend Mr. Anderson from working as a longshoreman for a period of six months, and Plaintiff has failed
25 to produce sufficient evidence to rebut this finding.  Accordingly, the court finds no material issue of fact
26 remains for trial and summary judgment should be entered in favor of defendants.  Finally, the court
27 dismisses any state claims presented by Plaintiff as they would be preempted and time barred by Section
28 301 of the Labor Management Relations Act.

Defendants' motions for summary judgment are hereby GRANTED, and Plaintiff's claims and causes of action are dismissed.

Dated this 17th day of November, 2006.

*/s/ J. Kelley Arnold*
J. Kelley Arnold
United States Magistrate Judge

Page - 14